# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **SANDRA D. CHAMBERS ,** | ) | Case No. 04-6959-TOM-7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **SANDRA D. CHAMBERS,** | ) | |
| | ) | |
| Plaintiff | ) | A.P. No. 04-00166 |
| | ) | |
| vs. | ) | |
| | ) | |
| **FLORIDA DEPARTMENT OF EDUCATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding is before the Court following a trial on August 1, 2005, on the Debtor's adversary proceeding to determine the dischargeability of student loans pursuant to 11 USC section 523(a)(8) filed by the pro se Debtor / Plaintiff, Sandra D. Chambers ("Ms. Chambers" or "Debtor"). Appearing at the trial were: Ms. Chambers, the Plaintiff; Pamela Lutton-Shields, attorney for the Defendant, the Florida Department of Education ("FDOE"); and Jim Chambers ("Mr. Chambers"), Ms. Chambers' husband and witness for the Debtor. The Court has jurisdiction pursuant to 28 U.S.C. §§151, 157(a) and 1334(b) and the United States District Court for the Northern District of Alabama's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).[2]

---

[1] 28 U.S.C. § 151 provides:

In each judicial district, the bankruptcy judges in regular active service shall constitute

Ms. Chambers filed this individual Chapter 7 case on August 10, 2004.[3] She then filed this adversary proceeding on September 10, 2004 to determine the dischargeability of certain student loan obligations to the FDOE. She received a chapter 7 discharge on January 11, 2005.

The Court has considered the pleadings, the arguments of counsel and Ms. Chambers, briefs

---

a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

28 U.S.C. § 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

28 U.S.C. § 1334(b) provides:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The General Order of Reference as amended provides:

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. § 157(b)(2)(I) provides:
    (b)(2)Core proceedings include, but are not limited to–
        (I) determinations as to the dischargeability of particular debts;

[3] Schedule I does not list her husband's income because Ms. Chambers testified that she and her husband have been separated on and off again on numerous occasions. Apparently, there is no formal separation agreement and she and her husband currently are living together.

submitted, the testimony, the evidence admitted and the law and finds and concludes as follows.[4]

## I. FINDINGS OF FACT[5]

### A. Loan Information

Between 1989 and 1992, when Ms. Chambers was in her early 50's, she signed promissory notes totaling $13,363.00 for four student loans (collectively the "Loans")[6]. See Stipulated Facts. The loan proceeds were used to assist her daughter with her living expenses and books while she was enrolled in nursing school at the University of Alabama. The initial repayment period on the Loans was 10 years, but they were deferred or placed in forebearance until late-1997. Id.

During the entire repayment period Ms. Chambers has made only one payment of $57.39. Id. As of August 1, 2005, the total owed on the Loans was $45,578.79 which included principal and interest of $37,982.33 plus a 20% collection fee of $7,596.47. Id. Interest continues to accrue at a rate of $4.79 per diem.[7] Id. At the present rate of interest, a monthly payment of $565.84 is necessary to pay off the loans in 10 years. Id. Unlike the U.S. Department of Education's William D. Ford Federal Direct Loan Program, no alternative repayment plans are offered by the FDOE.

FDOE is the type entity contemplated under 11 U.S.C. § 528(a)(8). Id. The Loans are an

---

[4] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[5] Ms. Chambers and the FDOE submitted *Stipulated Facts* ("*Stipulated Facts*") on July 29, 2005. Some of the facts in this section are taken from the *Stipulated Facts*. Further, pursuant to Fed. R. Evid. 201, this Court may take judicial notice of the contents of its own files. See ITT Rayonier, Inc. v. U.S., 651 F.2d 343 (5th Cir. 1981).

[6] Ms. Chambers was born on February 7, 1938. However, on each of the Loan applications that her date of birth was either "02/07/42" or "02/07/46." See FDOE's Exh. 1.

[7] The Loans have a variable interest rate which is currently 8.53%.

3

education debt as contemplated under 11 U.S.C. § 523(a)(8). Id. The Loans represent more than 80% of the total debt listed in Ms. Chambers' bankruptcy petition in this case.

### B. Personal and Family

Mr. Chambers graduated from the University of Miami in 1975 with a degree in business administration.[8] He and Ms. Chambers married in 1979 and lived in south Florida where Mr. Chambers was employed as a tax preparer and manager with H & R Block for 20 years. He was also a real estate broker and ran his own realty company in south Florida. At some point Mr. Chambers left H & R Block and started his own tax preparation business in south Florida. There was no testimony about Ms. Chambers' employment while she was living in Florida.

Mr. and Ms. Chambers separated in 2000, as they had done on several prior occasions, and Ms. Chambers moved to Birmingham to be closer to her daughter for whose the benefit the student loans were taken, who has been a nurse anesthetist in Birmingham since graduating from the University of Alabama in 1992. She lived with her daughter for six months when she first moved to Birmingham but subsequently moved into her own apartment in Hueytown, Alabama.

Ms. Chambers testified that after moving to Alabama she applied for several jobs but was unable to find a full time position. She took a part time position with Winn Dixie in Hueytown. She is still employed by Winn Dixie although she is concerned about losing her job because of the recent downsizing within the company. She works between 22 and 32 hours per week, although her hours usually increase during the holiday season. Ms. Chambers is currently 67 years old and is unsure how much longer she can continue working.

---

[8] There was no testimony about Ms. Chambers' level of education.

4

In 2003, Mr. Chambers moved to Birmingham and began living with Ms. Chambers.[9] He took a temporary position with Buffalo Rock. Since moving to Alabama, he has continued operating his tax preparation business in Florida and returned to Florida during tax season in 2004 and 2005.

Despite living together in Hueytown since 2003, Ms. Chambers contends that she and her husband are still separated. No written separation agreement was mentioned or offered into evidence.

Ms. Chambers testified that she suffers from several medical problems including Hashimoto's disease (hypothyroidism) which causes her to suffer numbness, fatigue and memory loss. She also suffers neck and back pain from an injury sustained in a automobile accident several years ago. She testified that she has needed dentures for five years but has been unable to afford them. See Debtor's Exh. 10. Similarly, Mr. Chambers testified that he suffers from medical ailments as well, including high blood pressure, arthritis and dental problems. He also testified that he had a heart attack in early-May 2005 and had a tumor removed from his forehead two weeks before this trial. He said he currently takes twelve prescriptions to control his health problems.

Ms. Chambers testified that she drives her daughter's 1993 Honda which may need to be replaced with a more reliable vehicle soon.

### C. Income and Expenses

Ms. Chambers testified that her monthly income is $1,611.00 although her Schedule I reflects

---

[9] Although there was contradictory testimony about Mr. Chambers' move to Alabama, the Court finds that he moved here in 2003 and has lived here continuously, other than trips to Florida during tax season, since that time.

Ms. Chambers testified that Mr. Chambers moved to Birmingham in 2003 "because he was out of work and sick with diabetes." She later testified that he moved here in 2004 to help with her bankruptcy.

5

a monthly income of $1,231.00. However, between June 2003 and December 2004, monthly deposits into Ms. Chambers bank account averaged over $2,000.00. FDOE Exh 3. She testified that she receives $697.00 in social security but did not testify about her earnings from Winn Dixie.

According to Schedule J, Ms. Chambers' monthly expenses total $1,480.00 which includes two monthly credit card payments of $230.00.[10] Since these credit card debts were discharged in this case they should not have been included in Ms. Chambers' monthly expenses.[11] The following chart summarizes her expenses as listed on Schedule J:

|  | **Monthly expenses based on Schedule J** |
|---|---|
| Rent | $390.00 |
| Electricity / Heat | $100.00 |
| Telephone | $100.00 |
| Credit Cards | $230.00 |
| Food | $200.00 |
| Clothing | $32.00 |
| Laundry / Dry Cleaning | $30.00 |
| Medical / Dental Expenses | $50.00 |
| Transportation | $50.00 |
| Recreation | $20.00 |
| Health Insurance | $48.00 |

---

[10] The Court believes Ms. Chambers made a clerical error and listed the credit card payment twice.

[11] Based on the remainder of Schedule J, Ms. Chambers' monthly expenses are $1,020.00. However, because the FDOE did not raise this issue prior to or at trial the Court will use only the expense figures provided in Ms. Chambers' petition and testimony.

6

| | |
|---|---|
| Other Credit Cards | $230.00 |
| **Total Monthly Expenses** | **$1,480.00** |

At trial, Ms. Chambers testified that her monthly expenses were $1,677.00. However, she offered few details about how she reached that number and the FDOE did not fully explore her monthly expenses. Ms. Chambers' apartment is equipped with two telephone lines, one for her and one for Mr. Chambers to use for his business. She testified that her monthly telephone bill is $98.00, although she sometimes pays for Mr. Chambers' telephone line which is an additional $77.00 per month. According to her testimony her other monthly expenses include: $69.00 for cable, $40.00 for gasoline, $100.00 for laundry. She did not testify about any other expenses.

After Ms. Chambers moved to Alabama her daughter took out a term life insurance policy for her. According to Ms. Chambers' testimony and bank statements, her daughter transfers $100.00 each month into her bank account to pay the monthly insurance premium. See FDOE Exh. 3. She also testified, and bank records show, that her daughter occasionally made small cash "loans" ($20.00 or $30.00) to her and advanced her $390.00 on several occasions. See Id. She testified that she repaid these "loans" but neither bank records nor testimony show any transfers back to her daughter. See Id.

Although Mr. Chambers testified that he does not provide regular financial assistance to Ms. Chambers, Ms. Chambers testified that she has occasionally received money from him for bills and other expenses. Mr. Chambers testified that his only income is $675.00 per month in social security in addition to what he makes during tax season, which, in 2004, was between $8,000.00 and

7

$9,000.00.[12]

### D. The California property and bankruptcy cases

In 1981, Ms. Chambers was left an interest in a home in California (the "California Property") when her father passed away. There was apparently a dispute and prolonged litigation over title to the California Property but that problem seems to have been resolved.[13] According to Mr. Chambers, the California Property is now titled to him and Ms. Chambers jointly.

In 1997, Mr. and Ms. Chambers filed a pro se joint chapter 7 bankruptcy in Florida (the "Florida case"). Mr. Chambers testified when the Florida case was filed they were both unemployed and "knew that the student loans were going to be coming out of forebearance ... and we were going to have to start paying on them." According to testimony, they received a chapter 7 discharge in February 1998 but converted it to a chapter 13 in 2000 and reconverted it to a chapter 7 later that same year.

Ms. Chambers' one-half interest in the California Property was disclosed in the Florida case, and according to Mr. Chambers' testimony had a current market value at the time of $50,000.00. The California Property was never administered in the Florida Case because of an apparent dispute with the chapter 7 trustee over the use of proceeds that were to be derived from the sale of that property. However, for the purposes of this case, the Chambers' dispute with the Florida trustee is irrelevant other than to show that the California Property was not administered in that case and remains titled to the Chambers.

---

[12] Based on the testimony, it appears that Mr. Chambers continues to operate various businesses in south Florida. He maintains a complex web of telephone numbers, voice mail boxes and mailing addresses in that area that is unnecessary for the Court to untangle.

[13] Mr. Chambers testified that Ms. Chambers' aunt had a life estate in the property.

8

Case 04-00166-TOM   Doc 36   Filed 08/16/05   Entered 08/16/05 11:09:04   Desc Main
Document      Page 8 of 20

The California Property was disclosed on Schedule A in this case, which noted that Ms. Chambers' one-half interest in the property has a current market value of $100,000.00.

## II. CONCLUSIONS OF LAW

Congress' main purpose in enacting the Bankruptcy Code was to ensure the insolvent debtor a fresh start by discharging his prepetition debts. Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234 (1934)). In furtherance of Congress' fresh start policy, the Eleventh Circuit has generally construed exceptions to discharge narrowly. Haas v. Internal Revenue Service (In re Haas), 48 F.3d 1153, 1158 (11th Cir. 1995); Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). However, 11 U.S.C. § 523(a)(8) specifically provides that only in certain circumstances will education loans extended by or with the aid of a governmental unit or nonprofit institution solely on the basis of the student's future earnings potential be discharged in bankruptcy. Several reasons have been cited to explain why Congress excepted student loans from a discharge in bankruptcy. One source claims that it was in response to "the perceived need to rescue the student loan program from insolvency, and to also prevent abuse of the bankruptcy system by students who finance their higher education through the use of government backed loans, but then file bankruptcy petitions immediately upon graduation even though they may have or will soon obtain well-paying jobs, have few other debts, and have no real extenuating circumstances to justify discharging their educational debt." Green v. Sallie Mae (In re Green), 238 B.R. 727, 732-733 (Bankr. N.D. Ohio 1999) (citing the "Report of the Commission on the Bankruptcy Laws of the United States," H.R. DOC. NO. 93-137, 93d Cong., 1st Sess., Pt. II 140, n.14). Another source claims that Congress enacted 11 U.S.C. § 523(a)(8) to ensure that these kinds of loans could not be discharged by recent graduates who would then pocket all future benefits

9

derived from their education. <u>Andrews Univ. v. Merchant (In re Merchant)</u>, 958 F.2d 738 (6th Cir. 1992) (<u>citing</u> H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 466-75 reprinted in 1978 U.S.C.C.A.N. 5787).

However, notwithstanding these policy concerns, Congress also realized that not all student debtors abused the bankruptcy system, and that some student debtors were truly in need of bankruptcy relief. Thus, Congress determined that an absolute bar to the dischargeability of student loan debts would be too harsh and also unnecessary to effectuate the foregoing policy goals. Consequently, unlike other types of debt, such as alimony and child support for which a debtor cannot receive a bankruptcy discharge, Congress permitted student loan debts to be discharged if the debtor could demonstrate extenuating circumstances.

### A. Dischargeability

A student loan is not dischargeable "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents."[14] 11 U.S.C.§ 523(a)(8). The creditor bears the initial burden of both proving that a debt is owed and such debt is the type contemplated by § 523(a)(8). <u>Roe v. The Law Unit, et al. (In re Roe)</u>, 226 B.R. 258, 268 (Bankr. N.D. Ala. 1998). Once proven, the burden shifts to the debtor to show that repayment of the debt

---

[14] Section 523(a)(8) provides :

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

10

Case 04-00166-TOM    Doc 36    Filed 08/16/05    Entered 08/16/05 11:09:04    Desc Main
Document    Page 10 of 20

would cause an undue hardship. Id. The appropriate standard of proof for § 523(a)(8) is a preponderance of the evidence. Grogan v. Garner, 498 U. S. 279, 290 (1991).

### 1. The Debt

Ms. Chambers acknowledged in the *Stipulated Facts* submitted to the Court that she owes the debt to the FDOE, that the FDOE is the type of entity contemplated by § 523(a)(8) and that the Loans are the type contemplated by § 523(a)(8). Therefore, the burden at trial was shifted to Ms. Chambers to prove that repayment of the debt would be an undue hardship.

### 2. Undue Hardship

The Eleventh Circuit Court of Appeals recently adopted the three part test for proving "undue hardship" that was first articulated by the Second Circuit in Brunner v. New York State Higher Educ. Serv. Corp, 831 F.2d 395 (2d Cir. 1987). Hemar Ins. Corp. of Am. v. Cox (In re Cox), 338 F.3d 1238 (11th Cir. 2003). Quoting Brunner, the Eleventh Circuit stated that

> [to establish "undue hardship," the debtor must show] (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Cox, 338 F.3d at 1241. This Court previously used the three part test established in Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson), 5 Bankr. Ct. Dec. 532, 536-545 (Bankr. E.D. Pa. 1979) when determining undue hardship for student loan dischargeability. However, the Court now uses the Brunner test to conform with the Eleventh Circuit's holding in Cox.

### I. First Brunner Factor

The first Brunner factor requires Ms. Chambers to prove that based on her current income and expenses she cannot maintain a "minimal" standard of living for herself if she is forced to repay the student loans.[15] Courts have taken differing views about what constitutes a "minimal" standard of living. Few courts still use the United States Department of Health and Human Services Poverty Guidelines as a "bright line" determination of the minimal standard of living for student loan dischargeability purposes.[16] The Court does not believe that, in most cases, a debtor and his family living at or slightly above the federally defined poverty line is maintaining a "minimal" standard of living. Therefore, this Court rejects the notion that a debtor must fall below the federal poverty line to discharge a student loan.

This Court believes that a more thoughtful, analytical approach should be taken. A minimal standard of living lies somewhere between "poverty and mere difficulty." McLaney v. Kentucky Higher Educ.Assistance Authority (In re McLaney), 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004). The court must examine the debtor's living situation to ensure that the debtor has no unnecessary and frivolous expenses; however, the debtor should not be forced to live in abject poverty with no comforts. Judge Benjamin Cohen best described a minimal standard of living as "a measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities." Ivory v. United States Dep't. of Educ.

---

[15] Because Ms. Chambers maintains that she and her husband are separated the Court considered only Ms. Chambers when calculating the poverty level based on family size.

[16] These guidelines define eligibility for certain government benefits and programs and are designed to assist the needy and economically disadvantaged. According to the 2005 Health and Human Services Poverty Guideline, the poverty level for a family of one is $9,570.00 per year. Federal Register, Vol. 70, No. 33, February 18, 2005, pp. 8373-8375, *available at* http://aspe.hhs.gov/poverty/05poverty.shtml (last visited August 12, 2005.)

12

(In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001). Judge Cohen went on to list numerous basic necessities needed to maintain a minimal standard of living:

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
> 6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

Id. Brunner requires that this determination be based on the debtor's current income and expenses, thus the Court must look at the debtor's income and expenses at the time of trial. See Cox, 338 F.3d at 1241.

In this case, Ms. Chambers testified that her monthly income is $1,611.00 and she receives no additional financial support from her husband or daughter. The Court questions the veracity of this testimony especially since monthly deposits into her bank account between June 2003 and December 2004 averaged over $2,000.00 and her husband, with whom she lives, receives a monthly social security check of nearly $700.00.[17] However, the Court will give Ms. Chambers the benefit of the doubt and base its analysis only her stated monthly income of $1,611.00.

---

[17] If Mr. Chambers receives income from his businesses or other sources was never fully explored at trial.

13

Ms. Chambers provided the Court with two different monthly expense figures. According to her testimony her monthly expenses are $1,677.00 but she listed monthly expenses of $1,480.00 on Schedule J.[18] Therefore, the Court will perform its analysis under the first Brunner factor using both numbers.

Since no alternative repayment plans are offered by the FDOE, Ms. Chambers' monthly student loan payment will be $565.84. Based on either of the two monthly expense figures provided by Ms. Chambers, she has insufficient excess monthly income to make this student loan payment. According to her scheduled expenses she has $131.00 in excess monthly income. Based on her testimony expenses, her monthly expenses exceed her monthly income by $60.00. Therefore, using either monthly expense amount, Ms. Chambers will be unable to make this student loan payment while also paying her existing monthly expenses.

There was little testimony about Ms. Chambers actual monthly expenses. Based on the testimony and evidence presented the Court does not believe Ms. Chambers' expenses are abnormally high and therefore finds it unnecessary to provide a detailed description of her schedules.

Based on the foregoing, the Court believes that based solely on Ms. Chambers' income (without any assistance from her husband or daughter) she could not maintain a "minimal" standard of living for herself if forced to repay the Loans at this time. Therefore, Ms. Chambers has successfully proven to the Court that she meets the first factor of the Brunner test.

### ii. Second Brunner Factor

The second Brunner factor requires the debtor to show additional circumstances indicating

---

[18] As previously noted the credit card debts included on Schedule J were discharged and should not have been included in Ms. Chambers' current monthly expenses unless she is voluntarily paying them even though she filed this case. See footnote 11 herein.

14

that his or her state of affairs (that is, his inability to maintain a minimal standard of living if forced to repay the student loans) is "likely to persist for a significant portion of the repayment period." Brunner, 831 F.2d at 396. These circumstances must demonstrate a "certainty of hopelessness, not simply a present inability to fulfill financial commitment." Nys v. Educ. Credit Mgmt., Corp. (In re Nys), 308 B.R. 436, 443 (B.A.P. 9th Cir. 2004). See also Cox, 338 F.3d at 1242. While there is no definitive list of what are considered "additional circumstances," they may include:

> 1. Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement;
> 2. The debtor's obligations to care for dependents;
> 3. Lack of, or severely limited education;
> 4. Poor quality of education;
> 5. Lack of usable or marketable job skills;
> 6. Underemployment;
> 7. Maximized income potential in the chosen educational field, and no other more lucrative job skills;
> 8. Limited number of years remaining in work life to allow payment of the loan; Brunner,
> 9. Age or other factors that prevent retraining or relocation as a means for payment of the loan;
> 10. Lack of assets, whether or not exempt, which could be used to pay the loan;
> 11. Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;
> 12. Lack of better financial options elsewhere.

In re Nys, 308 at 446-47 (internal citations omitted). Where the debtor is "apparently healthy, presumably intelligent and well-educated, and shows no evidence of extraordinary burdens which would impair further employment prospects" discharge of student loan obligations is inappropriate." Shankwiler v. Natl. Student Loan Marketing, et al. (In re Shankwiler), 288 B.R. 701, 706 (Bankr. C.D. Cal. 1997).

Ms. Chambers is 67 years old and despite some minor medical problems appears to be relatively healthy for her age. Given her age, her current job and her earning potential, it is unlikely

15

she will see a significant increase in her income over the next ten years, the Loan repayment period.[19] The Court notes, however, the possibility that Ms. Chambers' daughter (for whose benefit the debt was incurred and who is a highly paid medical professional), or her husband (with whom she currently lives) may decide to provide financial assistance to her in the future which would certainly change her financial condition. This is only speculation, though, and the Court has not considered it in making its determination under the second <u>Brunner</u> factor.

Based on the foregoing, the Court finds that Ms. Chambers' financial condition, in so far as it was described to the Court and described previously in this Opinion, is likely to persist for all or at least a significant portion of the ten year Loan repayment period. Therefore, Ms. Chambers has successfully proven to the Court that she meets the second factor of the <u>Brunner</u> test.

### iii. Third <u>Brunner</u> Factor

The third <u>Brunner</u> factor requires a showing that the debtor made a good faith effort to repay the student loans. <u>Brunner</u>, 831 F.2d at 396. What is considered a debtor's good faith effort varies widely among courts; however, courts are generally reluctant to find good faith where a debtor made minimal or no payments on his or her student loans. See, e.g., <u>Murphy v. CEO/Manager, Sallie Mae, et al. (In re Murphy)</u>, 305 B.R. 780 (Bankr. E.D. Va. 2004)(no good faith where the debtor made no payments on her student loans); <u>Garrett v. New Hampshire Higher Educ. Assistance Found., et al. (In re Garrett)</u>, 180 B.R. 358, 364 (Bankr. D.N.H. 1995)(no good faith shown where "[t]he record is devoid of any payment made by [the debtor] on these loans or even any attempt to enter into a repayment schedule with [the lenders]"). Other factors to consider include the amount of the student

---

[19] It should be noted, however, that Ms. Chambers' has a one-half interest in the California Property that, if sold or mortgaged, would significantly increase her income.

Case 04-00166-TOM    Doc 36    Filed 08/16/05    Entered 08/16/05 11:09:04    Desc Main
Document      Page 16 of 20

loan debt as a percentage of the debtor's total indebtedness and whether the debtor attempted to find employment. See, e.g., Murphy, 305 B.R. at 798 (citing Hall v. U.S. Dep't. of Educ. (In re Hall), 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002)(citations omitted).

Ms. Chambers argues, *inter alia*, that her diligence in seeking deferments and stays through numerous bankruptcies demonstrates her good faith effort to repay the Loans. The Court disagrees and finds to the contrary. Ms. Chambers, who was in her early-50's when she took the Loans, used deferments and bankruptcies to delay repayment of the Loans for nearly two decades, knowing that the Loans would eventually come due. The loans have finally come due, and Ms. Chambers now seeks sympathy from this Court because of her current situation. A situation that, the Court notes, is completely of her own making and a result of her voluntary deferments of the Loans.

The California Property owned by the Chambers is worth, according to Schedule A, at least $200,00.00. There was no testimony that the house is encumbered by any liens or mortgages. Ms. Chambers cannot argue that she has made a good faith effort to repay her loans while holding an unencumbered asset such as the California Property, especially when that home is not her primary residence. By selling or mortgaging the property Ms. Chambers could repay the Loans in full and satisfy her obligation to the FDOE. Thus, the Court finds that Ms. Chambers has not demonstrated a good faith effort to repay because she failed to use all of her assets, namely the California Property, to repay the Loans.

Further, while seeking deferments may in some cases help to show good faith, there must also be a showing that the Debtor(s) made an effort to make some, even if only partial, payments. That was not the case here. Since the first payment on the Loans came due, Ms. Chambers has made only one, small payment. She offered no testimony about why she made no Loan payments even

17

Case 04-00166-TOM    Doc 36    Filed 08/16/05    Entered 08/16/05 11:09:04    Desc Main
Document      Page 17 of 20

when her husband was employed as a tax preparer, and presumably, a realtor in Florida.

Another factor suggesting Ms. Chambers has not made a good faith effort to repay the Loans is that they represent more than 80% of the debts scheduled in this case and were also involved in her prior case(s) in Florida. Further, according to Mr. Chambers' testimony, the Florida Case was filed to avoid, or at least further delay, repayment of the Loans. This use of the bankruptcy system is contrary to the "fresh start" for the "honest but unfortunate debtor" purpose of the Bankruptcy Code. Although neither Mr. nor Ms. Chambers is an attorney, they have proven to the Court that they are well versed in bankruptcy law and have been more than capable in handling this case.

A Debtor may not repeatedly defer or otherwise delay repayment of a student loan and expect the Court to believe doing so demonstrated his or her good faith efforts to repay the loan. That is precisely what Ms. Chambers is asking this Court to do by arguing that the repeated deferments show good faith. Through repeated deferments and bankruptcies she successfully avoided repayment for nearly two decades and now wants to discharge the Loans in part because of her age.

Based on the foregoing, the Court finds that Ms. Chambers has not demonstrated a good faith effort to repay her student loans and has thus failed to satisfy the third element of the <u>Brunner</u> test. Therefore, because Ms. Chambers failed to meet the third Brunner element she has not proven that she will suffer an undue hardship if forced to repay her student loans. Therefore, the Court finds that Ms. Chambers' student loans are not dischargeable under 11 U.S.C. §523(a)(8).

### III. CONCLUSION

Discharge of student loan obligations should be limited to only exceptional cases. This is not such a case. Ms. Chambers failed to prove that she will suffer undue hardship if forced to repay her student loan obligations to the FDOE. While the Court can sympathize with Ms. Chambers'

situation it cannot reward her for bringing this very set of circumstances on herself and the Court does not believe the facts of this case warrant a discharge of her student loan debt. Therefore, the Court finds that Ms. Chambers' student loan obligation to the FDOE is not dischargeable under 11 U.S.C. § 523(a)(8). Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Debtor, Sandra Chambers, to declare her student loan debt dischargeable pursuant to 11 U.S.C. § 523(a)(8) is **DENIED.** Accordingly, the balance of Ms. Chambers' student loan debt owed to the Defendant, the Florida Department of Education, is hereby declared to be **NONDISCHARGEABLE**.

Dated this the 16th day of August, 2005.

**/s/ Tamara O. Mitchell**
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM:jdg

xc: Sandra Chambers, Pro Se Plaintiff
Pamela Lutton-Shields, attorney for the Defendant, the Florida Department of Education

19

20